U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 DEC 11 PM 2:30

CLERK
BY ____PC____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:12-cr-78 |
| ) | |
| BENJAMIN H. WEISINGER ) | |

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE**
(Doc. 15)

This matter came before the court on October 25, 2012 for an evidentiary hearing on Defendant Benjamin Weisinger's motion to suppress statements and physical evidence. (Doc. 15.) The parties completed their post-hearing filings on November 16, 2012.

Defendant is charged in a two count indictment with knowingly using a minor, J1, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, using materials that have been transported in interstate commerce in violation of 18 U.S.C. § 2251(a), and knowingly possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B).

Defendant seeks suppression of statements he made to law enforcement during an interview at a friend's residence on November 6, 2011,[1] arguing that he was subject to custodial interrogation without the benefit of *Miranda* warnings. He also seeks suppression of physical evidence obtained from his cell phone, arguing that he did not give the detectives voluntary consent to conduct a search. The Government opposes the motion.

The Government is represented by Assistant U.S. Attorney Wendy L. Fuller. Defendant is represented by Assistant Federal Public Defender David L. McColgin.

---

[1] The court has reviewed both an audio recording and a transcript of a November 6, 2011 interview of Defendant.

I.  **Findings of Fact.**

On November 6, 2011, at approximately 11:00 a.m., VSP Detective Ingrid Jonas of the Special Investigative Unit ("SIU") of Lamoille County responded to a parental complaint that Defendant had molested the parent's minor child, identified herein as "J1." The first officer to arrive at J1's mother's home was VSP Sergeant David Peterson. J1's mother informed Sergeant Peterson that Defendant was her boyfriend and lived in the house with her, and that she had found a video of J1 on Defendant's laptop earlier that morning. The video had been sent from the family email account to a Gmail address. Detective Jonas conducted an interview with J1 that afternoon.

Later that evening, Detective Jonas learned that Defendant was at a friend's house in Wheelock, Vermont. Detective Jonas and Detective Sergeant Jason Letourneau of the VSP Bureau of Criminal Investigation travelled to the house, arriving at approximately 8:15 p.m. and knocked on the front door. When the homeowner answered, the detectives identified themselves and asked to speak with Defendant. The detectives were dressed in plain clothes and jackets. Both were wearing concealed sidearms, which may have caused visible bulges in their jackets.

The homeowner led the detectives through a mudroom and into the living room, where Defendant was watching television. The detectives introduced themselves and Detective Jonas asked whether Defendant would be willing to speak with them. Defendant said that he was willing to talk and Detective Jonas asked if there was somewhere private where they could speak. The homeowner offered the use of his garage, which was heated and furnished. While the homeowner led Defendant and the detectives through the mudroom and into the garage, Detective Jonas surreptitiously turned on a recording device. When they arrived at the garage, the homeowner turned on the heat and left.

Once in the garage, Defendant sat on a stool while Detective Letourneau stood and Detective Jonas stood or sat within three to four feet of Defendant. Detective Jonas began the interview by again asking whether Defendant would be willing to speak with the detectives "for a couples of minutes." Tr. 11/06/11 at 2. Defendant answered

2

affirmatively, and the detectives interviewed him about the allegations of child molestation and production of child pornography. During the interview, the doors into the garage were shut. Detective Jonas intended to arrest Defendant at the conclusion of the interview but did not disclose this intent to Defendant. The detectives did not tell Defendant whether he was under arrest, or whether he was free to leave or stop the interview. They did not handcuff Defendant, restrain him, use or threaten to use force, or use deceptive or intimidating tactics. Both Defendant and the detectives spoke in conversational tones during the entire interview, which lasted less than thirty-five minutes. Defendant did not ask the detectives to leave or to stop questioning him.

During the conversation, the detectives repeatedly confronted Defendant with evidence of his guilt, advising him that based on information they had already acquired from J1 and from searches of J1's cell phone, Defendant's computer, and several email accounts, the evidence against him was "overwhelming right now, and we're not even finished yet." *Id.* at 15. They suggested that further computer analysis would confirm Defendant's guilt. The detectives told Defendant that "this doesn't just go away with you sitting there with your arms folded feeling anxiety and nervous and saying no." *Id.* at 21. In the course of the interview, the detectives told Defendant at least eight times they did not believe he was being truthful or that his answers were inconsistent with their investigation. They also told him they already had "a pretty good sense about ninety percent of it, and there's probably another ten percent that will be clear to us tomorrow." *Id.* The detectives explained to Defendant that at a "first meeting like this," he had an opportunity to be truthful. *Id.* at 23. Defendant nonetheless persisted in proclaiming his innocence and honesty. When the detectives asked him to identify his Gmail account address, Defendant denied having a current one and provided an old Gmail account address, which was not linked to the detectives' investigation.

In the middle of the interview, the detectives asked Defendant: "[h]ow are you feeling right now talking to us?" to which Defendant responded "Okay. I'm just a little distraught over the whole day situation." *Id.* at 19. The detectives repeatedly expressed their understanding that Defendant was in a difficult situation. Despite asking Defendant

3

multiple pointed questions, the detectives' tone was neither confrontational nor aggressive. At the conclusion of the interview, Detective Jonas confirmed that Defendant did not have a problem talking with the detectives. Detective Jonas then advised Defendant that "we're going to have [to] take a trip down to the barracks." *Id.* at 25. Detective Letourneau twice asked Defendant whether he had "a problem" with going to the barracks, and Defendant answered that he did not.[2]

Before taking Defendant into custody, the detectives asked him whether he would consent to a search of his cell phone:

> DET. LETOURNEAU: Would you give me consent to take your phone?
>
> MR. WEISINGER: I can go get it for you.
>
> DET. LETOURNEAU: And you would hand it over to me?
>
> MR. WEISINGER: Yeah.
>
> DET. LETOURNEAU: Under consent?
>
> MR. WEISINGER: Yeah.
>
> DET. LETOURNEAU: Would you consent to allowing my computer forensics to look at your phone? Although I don't see -- well, I'm sure we'll find whatever has been sent to your phone, but are you fine with giving me your phone and signing a consent card that we analyze your phone?
>
> MR. WEISINGER: Well, I use it for my alarm clock, and I'm staying here, I don't know if they have an alarm downstairs or not. I always used it as my alarm when I was sleeping on the couch.
>
> DET. JONAS: Well, we might be able to get you another way to wake up in the morning tomorrow. But if you give us consent to take a look at the phone, that would be appreciated.
>
> DET. LETOURNEAU: I guess what we're saying is, are you willing to give us consent or not? I mean --
>
> MR. WEISINGER: I have nothing to hide.
>
> DET. LETOURNEAU: Okay. So you'd be willing to give us consent to take your phone and analyze your phone?
>
> MR. WEISINGER: Well, right now I use my phone.

---

[2] The Government concedes that Defendant was in custody once Detective Jonas advised him that he would have to accompany the detectives to the barracks.

4

DET. LETOURNEAU: Okay. So that would tell me then that you're not willing to let me take your phone.

MR. WEISINGER: I don't have an issue with it, but I'd like it back tonight.

*Id.* at 27.

After Defendant gave his consent, he collected his belongings and allowed the detectives to take his cell phone. The detectives then handcuffed Defendant and drove him to the barracks. Once at the barracks, Detective Letourneau asked Defendant to formalize his consent to search the cell phone by signing a consent form. The consent form states:

### CONSENT FORM
*(When probable cause exists and you intend to apply for a warrant.)*
I freely give my permission to Trooper Jason Letourneau and Ingrid Jonas of the Vermont State Police to conduct a complete search of the Samsung Cell Phone and its contents here under my control. I understand I do not have to allow this. No threats or promises have forced this consent.

(Government Exhibit C.) Before showing Defendant the form, Detective Letourneau read the form to Defendant, omitting the prefatory clause regarding probable cause and the intent to apply for a warrant. Defendant verbally agreed to give consent under the terms of the consent form. Detective Letourneau then handed Defendant the form, and Defendant read and signed it. The form is dated November 6, 2011, at 9:47 p.m.

On the night of November 6th, the detectives examined Defendant's cell phone and found an icon displaying the Gmail account which had been linked to their investigation. The detectives also found that the SD card, which holds information such as pictures and videos, had been removed.

Because Defendant had allowed the detectives to take his phone but had also stated that he wanted to use it as his morning alarm clock, the detectives understood his consent to be limited to that evening. As a result, the detectives retained the phone but delayed searching it further so that they could apply for a search warrant. On November 28, 2011, Detective Jonas applied for and was granted a warrant from a Vermont State Court judge to search Defendant's cell phone. One paragraph of Detective Jonas's supporting affidavit referenced the initial search of the phone, whereby the detectives

found the Gmail address linked to their investigation and discovered that the SD card was missing. The remainder of the affidavit contains information regarding the detectives' interviews with J1 and her mother, in which each had discussed Defendant's cell phone and its connection to the alleged crimes.

## II. Conclusions of Law and Analysis.

### A. Whether Defendant was Subject to Custodial Interrogation.

Defendant moves to suppress the statements he made to law enforcement in his friend's garage. The parties agree that Defendant was interrogated without *Miranda* warnings, and therefore the only issue is whether the interrogation was custodial in nature. Defendant argues that he was in custody because the detectives were visibly armed,[3] interviewed him alone in a room with closed doors, never told him he was free to leave or stop the questioning, repeatedly confronted him with evidence of his guilt, and arrested him at the conclusion of the interview. The Government argues that Defendant was not in custody because the detectives were dressed in plain clothes, asked and received permission to speak with Defendant, conducted the interview in the garage of his friend's home to protect Defendant's privacy, spoke in a conversational manner for less than thirty-five minutes, and did not restrain, intimidate, or mislead Defendant or suggest that he was not free to leave.

This court has previously found that "[a] criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." *United States v. Ramos*, 2012 WL 1854747, at *11 (D. Vt. May 21, 2012); *see also United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) ("[Defendant] had the burden of proving that he was under arrest or in custody[.]"). The test for "whether a suspect is 'in custody' is an objective inquiry," *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011), made after examining "all of the

---

[3] Defendant did not testify and thus there is no evidence that the detectives' sidearms were visible to him.

6

circumstances surrounding the interrogation." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

> Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion. . . . The circumstances also include, and especially so in border situations, the nature of the questions asked.

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). A court should "begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). "On the other hand, if a reasonable person would not have thought himself free to leave," the "court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* at 672.[4] "Only if the answer to this second question is yes was the person 'in custody[.]'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

The Second Circuit has held that "[t]he free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670. "The ultimate inquiry for determining *Miranda* custody is . . . whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Newton*, 369 F.3d at 670 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quotation omitted)).

Here, there is some evidence that supports a conclusion that a reasonable person in Defendant's circumstances would not feel that he was free to leave. Defendant was approached late in the evening by two police detectives, who asked to speak with him. In

---

[4] This is because the "free-to-leave inquiry reveals only whether the person questioned was seized," and "not every seizure constitutes custody for purposes of *Miranda*." *Newton*, 369 F.3d at 672.

7

making this request, the agents did not advise Defendant that he was free to refuse their request or free to leave. They also did not advise him that he was not under arrest, and in fact Defendant was arrested at the conclusion of the interview. During the interview itself, which took place in a closed garage where Defendant was separated from his friend, the detectives stood or sat in close proximity to him. They also repeatedly confronted Defendant with evidence of his guilt, advising him that based on information they had already acquired from J1 and from searches of J1's cell phone, Defendant's computer, and several email accounts, the evidence against him was "overwhelming." Tr. 11/06/11 at 15. *See United States v. Ali*, 68 F.3d 1468, 1472-73 (2d Cir. 1995) (finding that "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody," if those views "were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave"). The detectives also repeatedly told Defendant that they believed he was being dishonest.

As the Supreme Court has noted, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Beheler*, 463 U.S. at 1124 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Accordingly, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive" of whether a suspect is free to leave. *Stansbury*, 511 U.S. at 325.

In this case, several facts militate against a finding that the interview was unduly coercive. Defendant was interviewed in the home of a friend and was thus in familiar surroundings. *See United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) ("Courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings[].") (quoting 1 W. LaFave, Crim. Proc. § 6.6(e) (1984 & 1991 Supp.)); *see also United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir.

8

2006) (finding that a suspect interviewed in his girlfriend's home was less likely to be in custody because he was in a familiar, neutral setting); *United States v. Braxton*, 112 F.3d 777, 785 (4th Cir. 1997) (statement not involuntary where defendant "was interviewed by law enforcement officers around the kitchen table in his mother's home"); *United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (finding that custody was less likely where an interview "occurred in the familiar surroundings of [the defendant's] home"). Moreover, although the detectives clearly conveyed their belief in Defendant's guilt, the tone of the interview remained conversational, the detectives asked Defendant on several occasions if he was comfortable with them talking to him, and they did not subject Defendant to a "marathon session designed to force a confession." *United States v. Cunningham*, 2012 WL 369923, at *5 (D. Vt. Feb. 3, 2012) (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)) (finding that a forty-five minute interview was not custodial). Despite the detectives' repeated reference to the evidence they had accumulated against Defendant, Defendant's will was clearly not overborne as he continued to protest his innocence during the entire interview.

Although the detectives did not advise Defendant that he was free to leave (and in fact he was not), Defendant was not advised that he would be arrested at the interview's conclusion. His statements that he needed his cell phone to use as an alarm the following morning after sleeping on his friend's couch suggested that he subjectively held the reasonable belief that any detention would be temporary and brief. Because the subject of Defendant's leaving or the detectives leaving the friend's home was never raised, the failure to advise Defendant that he was not free to leave did not render the interrogation custodial. *See United States v. Benedict*, 104 F. Supp. 2d 175, 179 (W.D.N.Y. 2000) ("Defendant's argument that no one told [him] that he was free to leave is specious . . . no one told him that he could not leave.").

Although the facts support divergent conclusions as to whether a reasonable person in Defendant's position would have felt free to terminate the interview and ask the detectives to leave, the court need not resolve this issue because "the overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have

9

understood' [himself] to be 'subjected to restraints comparable to those associated with a formal arrest,'" *FNU LNU*, 653 F.3d at 153; *Newton*, 369 F.3d at 671. Here no such restraints have been established.

While the manner of law enforcement questioning may "substantially inform whether a reasonable person would feel restrained in a way similar to a formal arrest[,]" it must be evaluated in the context of other circumstances because "to look only at any single factor would be inconsistent with *Miranda*'s role as a protection against coercion." *FNU LNU*, 653 F.3d at 154 (noting that "[t]he rule exists to temper the 'potentiality for compulsion' that exists when an individual is 'cut off from the outside world' and subjected to 'incommunicado interrogation . . . in a police-dominated atmosphere'") (quoting *Miranda v. Arizona*, 384 U.S. 436, 457 (1966)). Detective Jonas began the interview by asking Defendant for his permission to speak with the detectives "for a couple of minutes." During the interview, the detectives referred to their investigation as ongoing and the interview itself as a "first meeting." They did not inform Defendant that he would be placed under arrest until after the interview was completed. "Decisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *Mitchell*, 966 F.2d at 98. Because the detectives did not prospectively reveal to Defendant their plan to arrest him, he cannot rely on their undisclosed intent to establish that he was in custody during the interview itself. *J.D.B.*, 131 S. Ct. at 2402 ("[T]he 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant.") (quoting *Stansbury*, 511 U.S. at 323); *see also Berkemer*, 468 U.S. at 442 (holding that a defendant was not in custody prior to his formal arrest, even though the investigating officer had privately decided to take him into custody, because the officer did not communicate this decision and "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time").

Moreover, Defendant was not placed in handcuffs, "generally recognized as a hallmark of a formal arrest[,]" *Newton*, 369 F.3d at 676, and the detectives did not make

10

any attempts to restrict his movements. The use of the garage for the interview was suggested by Defendant's friend, not the detectives, and both Defendant and the detectives agreed to speak alone in the garage because of the private nature of their conversation. The garage itself was not a police-dominated atmosphere and Defendant was free to choose where to sit during the interview. Finally, the detectives did not display their sidearms or otherwise use or threaten force against Defendant. *See FNU LNU*, 653 F.3d at 155 (noting that officers never drew their weapons when determining that suspect was not in custody); *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (finding that a suspect was not in custody even though the interrogating officers "did have (holstered) guns, which may have been visible to the defendant").

Based upon the totality of the circumstances, Defendant has not established that his "freedom of action" was "curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672. For the foregoing reasons, Defendant's motion to suppress statements must be DENIED.

### B.  Whether Defendant's Consent to Search his Cell Phone was Voluntary.

Defendant also moves to suppress the evidence that the detectives discovered from his cell phone on November 6, 2011, arguing that his consent was involuntary because the officers made clear that his refusal would be futile. He points out that the prefatory clause on the consent form recites that "probable cause exists" and that the detectives "intend to apply for a warrant." The Government argues that Defendant's consent was voluntary, noting that Defendant twice gave oral consent to the search before he became aware that the consent form referenced probable cause or the intent to seek a warrant.

The Government has the burden of proving that consent to conduct a search was freely and voluntarily given. *United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir. 1980). "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The Government acknowledges that Defendant was in custody by the time he gave consent, but "the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of

voluntariness[.]" *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (citing *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary)).

Moreover, the voluntariness of consent is not negated by an officer's statement that he will apply for a warrant if consent is refused. *See United States v. Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995) (holding that consent was voluntary where officers told a suspect that they would remain in his home indefinitely until they obtained a search warrant); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (consent was voluntary when officers told a suspect that they "could obtain a warrant" because the statement was "clearly true in light of the ample evidence of illegal activity" and "advising a person of the fact that a search warrant can be obtained does not constitute coercion"); *United States v. Miley*, 513 F.2d 1191, 1204-05 (2d Cir. 1975) ("Defendant's contention that he signed the consent form only after the agents led him to believe that obtaining a search warrant was a mere formality, even if true, would not advance his cause, since any such suggestion in this case would have been wholly accurate; there was clearly sufficient evidence here to justify issuance of a warrant and for that matter to predict its issuance with confidence[.]"). The Second Circuit has held that "[t]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *Isiofia*, 370 F.3d at 231 (quoting *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)); *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

In this case, Defendant twice verbally consented to a search of his cell phone before he was presented with the consent form which he contends was coercive. His only limitation on his consent was that he wanted his cell phone returned that night so that he could use it the following morning as an alarm clock. When Detective Letourneau asked whether Defendant would allow the detectives to take the phone and analyze it "under

12

consent," Detective Letourneau did not refer to a potential search warrant. Later, when Detective Letourneau asked Defendant to orally confirm his consent at the barracks, Detective Letourneau read the consent form to Defendant but omitted the prefatory clause regarding probable cause and a warrant. Only after Detective Letourneau handed Defendant the consent form to sign was Defendant put on notice that the detectives might obtain a search warrant if he refused. Furthermore, nothing in the record suggests that reading the prefatory clause materially affected Defendant's decision to confirm his consent a second time, as he signed the form without comment or hesitation.

When Defendant appeared to equivocate in his consent by mentioning that he needed to use his phone as an alarm, Detective Letourneau did not press him, but instead proceeded with caution, stating: "Okay. So that would tell me then that you're not willing to let me take your phone." Tr. 11/06/11 at 27. Defendant corrected him, stating: "I don't have an issue with it, but I'd like it back tonight." *Id.* Detective Letourneau's statement made it clear that Defendant was free to refuse to consent, but instead of doing so, Defendant merely limited the scope of his consent.

Based upon the totality of the circumstances, it was objectively reasonable for the detectives to believe that Defendant had given them time-limited consent to search his cell phone that evening. They briefly did so and confirmed that the cell phone contained a Gmail address linked to their investigation and was missing its SD card. Thereafter, the detectives retained the cell phone without further searching it until they obtained a valid search warrant on November 28, 2011. Defendant's motion to suppress the evidence obtained from his cell phone on November 6, 2011 must be DENIED.

### C. Whether the Evidence from Defendant's Cell Phone Would Have Been Inevitably Discovered by Lawful Means.

Finally, even if Defendant's consent had been involuntary, the Government has shown that "the information ultimately or inevitably would have been discovered by lawful means." *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Under the "inevitable discovery" doctrine, illegally-obtained evidence remains admissible if a court finds "with a high level of

13

confidence" that the evidence would have been legally obtained without the constitutional violation. *See United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006). Application of the doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, *what would have happened* had the unlawful search never occurred." *Eng*, 997 F.2d at 990 (quotation omitted). When evidence acquired from an illegal search is later used to obtain an otherwise valid search warrant, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *United States v. Reilly*, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996).

In this case, a search warrant was ultimately obtained on November 28, 2011 to conduct a full search of Defendant's cell phone. Defendant argues that if the initial search is held to be invalid, the warrant itself cannot provide independent "lawful means" for a search because one paragraph of the supporting affidavit references the missing SD card and email link found in the initial search. However, the remainder of the affidavit contains ample unrelated evidence sufficient to establish probable cause for the search, based upon J1's and her mother's statements and the evidence they provided to the detectives. Thus, even after "excising" the allegedly tainted evidence, there was sufficient "untainted evidence" to support issuance of a search warrant for Defendant's cell phone.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. 15) is DENIED. SO ORDERED.

Dated at Rutland, in the District of Vermont, this 11th day of December, 2012.

Christina Reiss, Chief Judge
United States District Court